IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
July 29, 2020 Session

**STATE OF TENNESSEE v. JODY ALAN HUGHES**

**Appeal from the Criminal Court for Bradley County**
**No. 16-CR-176C     Sandra Donaghy, Judge**

_____

**No. E2019-01185-CCA-R3-CD**

_____

The Appellant, Jody Alan Hughes, was convicted in the Bradley County Criminal Court of first degree premeditated murder; kidnapping, a Class C felony; tampering with evidence, a Class C felony; and conspiracy to commit tampering with evidence, a Class D felony. After a sentencing hearing, he received an effective sentence of life plus fourteen years. On appeal, the Appellant contends that (1) the evidence is insufficient to support the convictions; (2) the trial court erred by denying his "numerous" requests to represent himself; (3) the trial court erred by not allowing defense counsel to comment about the codefendants' exposure to prison sentences during counsel's opening statement; (4) the trial court erred in its wording of a curative instruction to the jury; (5) the trial court erred by limiting a codefendant's cross-examination about a false statement the codefendant made in a previous criminal case; (6) the trial court erred by limiting a detective's testimony regarding the codefendants' inconsistent statements; and (7) the trial court erred by not allowing testimony about a codefendant's pretrial statement to impeach the codefendant. Based upon the oral arguments, the record, and the parties' briefs, we find no reversible error and affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., J., and D. MICHAEL SWINEY, SP.J., joined.

Philip L. Duval (on appeal), Chattanooga, Tennessee, and Wilton Marble (at trial), Cleveland, Tennessee, for the appellant, Jody Alan Hughes.

Herbert H. Slatery III, Attorney General and Reporter; Garrett D. Ward, Assistant Attorney General; Stephen Davis Crump, District Attorney General; and Dallas Scott, III, and Drew Robinson, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

## I. Factual Background

On October 16, 2015, Jeff Crumley led detectives from the Bradley County Sheriff's Office (BCSO) to the body of twenty-five-year-old Tyler Worth. The body was wrapped in a blue tarp and was lying in a ravine near Kimsey Mountain Road in Polk County. An autopsy revealed the victim had been shot one time in the chest and one time in the right shoulder.

In May 2016, the Bradley County Grand Jury returned a six-count indictment, charging the Appellant alone with the first degree premediated murder and kidnapping of the victim in counts one and two, respectively. In count three, the grand jury charged Jeff Crumley; Gus Hawkins, Jr.; R.L. Jerger, Jr.; and Patricia Stanfield, the Appellant's mother, with being accessories after the fact. In count four, the grand jury charged Ashley Hughes, the Appellant's wife, with facilitation of first degree premeditated murder.[1] In count five, the grand jury charged Crumley, Hawkins, the Appellant, Jerger, and Ashley with conspiracy to commit tampering with evidence. In count six, the grand jury charged Crumley, Hawkins, the Appellant, Jerger, Ashley, and Stanfield with tampering with evidence. The Appellant was tried separately from his codefendants in May 2017.

At trial, Denny Worth testified that he was the victim's father and that he last saw the victim alive about September 20, 2015. The victim lived with his parents but was addicted to methamphetamine and would "come and go." In the latter part of September, the victim's father texted the victim and asked if the victim was "okay." The victim responded that he was okay and that he would be home soon. The victim was supposed to come home for a special dinner in the last few days of September but did not come. At that point, the victim's father became "very concerned." On October 15 or 16, the victim's father telephoned 911 and reported that the victim was missing. The police later contacted the victim's father and informed him that the victim was dead.

Twenty-nine-year-old Savannah Sullivan testified that the victim was a "family friend" and that she had known him since high school. In October 2015, Sullivan was a user of methamphetamine. Two or three weeks before the victim's death, the victim came to the house where Sullivan was staying. The victim had an ounce of methamphetamine and told Sullivan that he had stolen it from the Appellant. Sometime later, the victim telephoned Sullivan from the parking lot of a Cracker Barrel restaurant. The victim sounded scared and said he had "stolen more stuff." The victim asked Sullivan for a ride, but the victim was gone by the time Sullivan got to Cracker Barrel. Sullivan told the Appellant and Ashley that the victim stole the Appellant's "dope," but the Appellant and

---

[1] Because Ashley Hughes shares a surname with the Appellant, we will refer to her by her first name for clarity.

Ashley did not want to believe Sullivan. On cross-examination, Sullivan acknowledged that the Appellant and the victim were "good friends."

Twenty-seven-year-old Jonathan Sivley testified that he was addicted to methamphetamine for "a number" of years and that he had prior convictions of forgery and burglary of an automobile. The victim was a friend, and Sivley had known him about six years. The Appellant also was a friend, and Sivley bought methamphetamine from him. Sivley said that at the time of the Appellant's trial, Sivley had not used methamphetamine for six or seven months.

Sivley testified that the victim stole methamphetamine from the Appellant. The Appellant found out about the theft and "punish[ed]" Sivley and the victim by making Sivley watch the Appellant beat the victim in Jeff Crumley's basement. Sivley said the Appellant hit the victim across the face and "either busted his nose or broke it." The Appellant also hit Sivley on the head. The victim disappeared three or four days later. Sivley said it was "common knowledge" that the Appellant was dangerous.

Sivley testified that about 1:00 p.m. on October 11, 2015, R.J. Jerger "lured" him to "the compound," which Sivley described as a group of dilapidated houses in Cleveland, Tennessee, where people used illegal drugs. Sivley went to the compound to "retrieve" a backpack from Jerger, who had stolen the backpack from Sivley. While Sivley was at the compound, the Appellant arrived and "pulled a knife" on Sivley. Sivley ran into one of the houses and "barricaded" himself inside. The police arrived, and Sivley reported that the Appellant had assaulted him. On cross-examination, Sivley acknowledged that he and the victim stole items from the Appellant, including drugs. Despite the thefts, Sivley and the victim continued to "hang out" with the Appellant.

Nicholas Parker testified that he had two prior convictions of misdemeanor theft. In October 2015, Parker was living at the Econo Lodge in Cleveland, Tennessee, and was selling methamphetamine. Parker knew the Appellant, Sivley, and the victim. On the morning of October 11, the Appellant and Gus Hawkins came to Parker's motel room, and the Appellant demanded weapons from Parker. Parker gave the Appellant two firearms: a chrome nine-millimeter handgun and a black .40-caliber handgun. Parker said that the chrome handgun had belonged to the Appellant and that Parker had bought the gun from Hawkins. The black handgun belonged to Parker. Parker gave the two guns to the Appellant because he wanted to get the Appellant out of his room and did not want to argue with the Appellant. Parker testified that in March 2017, the Appellant offered him $10,000 to claim that R.L. Jerger was the person who came to Parker's room and obtained the chrome nine-millimeter handgun from Parker.

Thirty-six-year-old R.L. Jerger testified that he met the Appellant in 2007 or 2008 and that he had known the victim about one year at the time of the victim's death. Jerger said that he used to be addicted to methamphetamine but that he had not used

methamphetamine since October 11, 2015, the day of the victim's death. Jerger acknowledged that he had prior convictions of aggravated burglary, facilitation of aggravated robbery, conspiracy to commit aggravated robbery, and theft.

Jerger testified that he stole some "bookbags" from Jonathan Sivley, who had stolen the bookbags from the Appellant. On October 11, Jerger was at the compound and planned to "sell" the bookbags back to the Appellant in exchange for methamphetamine. Jerger talked with the Appellant on the telephone, and the Appellant told Jerger that he would pay Jerger $500 to "hold" Sivley at the compound until the Appellant could get there. Jerger agreed. Jerger then talked with Sivley and told Sivley that Sivley could come to the compound to get the bookbags.

Jerger testified that Sivley arrived at the compound. The Appellant also arrived, and he hit Sivley "a couple of times." Sivley "took off running," and Jerger and the Appellant chased him. Sivley broke into a house at the compound, and a neighbor telephoned the police. Jerger grabbed the bookbags, and he and the Appellant got into the Appellant's Nissan Xterra.

Jerger testified that Ashely Hughes was driving the Xterra and that the three of them began riding "up and down" the streets of Cleveland looking for Sivley. They saw the police at the house that Sivley had broken into. The victim, who was at an apartment on Green Drive, texted Jerger and asked for a ride, so Ashley drove to the apartment. The Appellant went into the apartment, and Jerger could see the Appellant "talking with his hands." Gus Hawkins came out of the apartment, and Ashley sent Jerger into the apartment to tell the Appellant to "hurry up." Jerger said that when he entered the apartment, the victim was sitting on the couch and "was throwing stuff in a bookbag." The Appellant told the victim, "Tyler, hurry up! [G]et your . . . stuff before I smack the [sh*t] out of you. Come on, let's go."

Jerger, testified that he, the Appellant, Hawkins, and the victim went to the Xterra and that the Appellant told the victim, "Tyler get in the 'F' in the car before I smack the [sh*t] out of you." Ashley was driving, and the Appellant was sitting in the front passenger seat. Jerger was sitting behind the Appellant, Hawkins was sitting behind Ashley, and the victim was sitting between Jerger and Hawkins. The victim seemed "skittish" and scared and "did not know what was going on." Ashley drove to the Econo Lodge. The Appellant and Hawkins went into one of the rooms and returned to the Xterra ten or fifteen minutes later. The Appellant had two pistols and "clicked" the guns together above his head. The Appellant and Hawkins got back into the Xterra, and the Appellant told Ashley to "drive." The Appellant turned around in the front passenger seat and was holding the chrome pistol. He told Hawkins, the victim, and Jerger that "one of you all is gonna die today. Somebody's dying." The Appellant demanded their cellular telephones and everything in their pockets.

- 4 -

Jerger testified that the Appellant told Ashley to drive to her "papaw's land" and that Ashley drove to a wooded area near Benton Pike. The victim had his "hands up" and was "freakin' out." The Appellant told Jerger, Hawkins, and the victim that "if anybody screams I'm gonna shoot you." When Ashley got to her grandfather's property, she told the Appellant that her grandfather was at home, so they left and headed toward Georgia. Jerger said that the Appellant was talking to the victim "about some stolen meth or something" and that the Appellant asked the victim about "a container of dope" the victim had taken. The Appellant said that he was "tired of doing people good, and everybody doing him dirty" and that he was "gonna make an example."

Jerger testified that the Appellant told Ashley to turn onto a one-lane dirt road. The road was similar to a logging road. Ashley drove about one mile and through "three washout areas" until the Appellant told her to stop. Everyone but Ashley got out of the Xterra, and the Appellant lined up Hawkins, the victim, and Jerger behind the vehicle. The Appellant was holding the chrome gun and told them to put their hands up. The black gun was in his waistband. The Appellant separated the victim from Hawkins and Jerger, and the victim told the Appellant, "Jody, please, no." The victim went toward the driver's side of the Xterra, and the Appellant followed him. Jerger heard one gunshot, and the victim fell. The victim got up and was facing the Appellant. The victim began backing away and yelling, "Jody, no, please! R.L. help." The victim went toward the passenger side of the Xterra, and the Appellant fired two more shots. Jerger said that the victim "dove for the bushes" and rolled against a tire. His mouth was full of blood, and he did not move again. Jerger said the victim was killed about 2:00 p.m.

Jerger testified that he was in fear for his life and that the Appellant was "pacing." Ashley got out of the Xterra and said, "[W]oo hoo, it's about time somebody did that." The Appellant told Jerger and Hawkins to look for his shell casings, but they did not find any casings. The Appellant moved the victim away from the tire, and Ashley backed up the Xterra. The Appellant got a blue tarp out of the back of the vehicle. Jerger and the Appellant rolled the victim into the tarp and dragged the tarp twenty-five to fifty feet into the woods. They all got back into the Xterra, and Ashley drove out of the area. Jerger broke the victim's telephone and threw it into one of the washouts as they were leaving.

Jerger testified that Ashley drove back to Cleveland and that the Appellant telephoned the Appellant's mother. The Appellant told his mother that he had done "some bad stuff" and that he thought he was in trouble. He asked her to meet him at Taco Bell and bring him some clothes. The Appellant also telephoned his friend, Jeff Crumley, and asked to borrow Crumley's truck. Ashley drove to Taco Bell. During the drive, Jerger disassembled the chrome gun and gave two large pieces of the gun to the Appellant. When they arrived at Taco Bell, Crumley and the Appellant's mother were there. The Appellant gave the two large gun pieces and the victim's bookbag to the Appellant's mother, and the Appellant's mother gave him some clothes. Ashley, the Appellant, Jerger, and Hawkins left Taco Bell, and Jerger threw the small gun pieces out the window.

Jerger testified that Ashley drove to a storage unit. The Appellant changed clothes and got shovels out of the unit. Ashley drove to Ace Hardware, where the Appellant bought a mattock, and to a BP gas station, where they met Crumley again. Jerger went inside to use the restroom, and Hawkins came inside to get Jerger. The Appellant, Jerger, and Hawkins got into Crumley's red truck. Crumley said he knew of "a perfect spot to dig a hole and bury a body" and drove them to a piece of property on Lead Mine Valley Road. Ashley followed in the Xterra. Crumley asked the Appellant if the Appellant shot the victim, and Hawkins answered, "[Naw], I did." Crumley responded that "it couldn't have happened to a better person."

Jerger testified that they went into a wooded area on Lead Mine Valley Road and that he, the Appellant, and Crumley dug a hole. They put the shovels into the back of Crumley's truck and hid the Xterra. All five of them got into Crumley's truck, and Crumley drove to Hardee's. They ordered food, and the Appellant paid for the food. Jerger identified a photograph of Crumley's truck, with shovels in the bed of the truck, at Hardee's and identified a photograph of himself, the Appellant, and Crumley inside Hardee's. They all got back into Crumley's truck, and Crumley drove "out to the scene" where the victim had been killed. They left, though, because it was getting dark. They drove to Lowes and Home Depot. Crumley said he did not want to use his truck anymore, so they drove to Crumley's house to get a silver Chevrolet Impala. Hawkins and Jerger got into the Impala, and Hawkins began driving back to the place where the victim had been killed. Crumley, the Appellant, and Ashley followed in Crumley's truck. Jerger said he and Hawkins "talked about just running, trying to make a run for it." However, the Appellant made Hawkins pull over, and Ashley got into the Impala and drove.

Jerger testified that they drove the Impala and Crumley's truck to the "Dollar store" and that the Appellant and Hawkins went inside the store. When they came out of the store, Hawkins got into the Impala and told Ashley to "go to the scene." During the drive, Jerger told Ashley that the Appellant was going to shoot him and Hawkins, but Ashley assured him that "as long as [they] did what [the Appellant] said, [they] were fine."

Jerger testified that when they got to the one-lane dirt road, everyone got into the Impala. Crumley drove the Impala to the location where they had left the victim's body, and the Appellant and Jerger dragged the body, which was still wrapped in the blue tarp, to the car. Jerger said that "[r]igor mortis had done set in" and that they "[h]ad to lay the back seat down" in order to get the victim into the trunk. They drove the Impala back to Crumley's truck, and Crumley, the Appellant, and Ashley got into the truck. They drove the two vehicles to the hole that had been dug on Lead Mine Valley Road.

Jerger testified that when they got on Lead Mine Valley Road, the Appellant told Jerger and Hawkins to get into the Xterra. The Appellant asked Jerger and Hawkins, "[I]f I give you all some money for a hotel room and some dope, can you all chill, get high, be

good, while I go take care of this[?]" Jerger said yes, so the Appellant drove Jerger and Hawkins to a motel. The Appellant returned Jerger's telephone and "dropped [them] out."

Jerger testified that he and Hawkins spent the next three days "[h]iding from [the Appellant] and his people." On Thursday, October 15, Jerger talked with Detective Brandon Edwards and ultimately "told [the police] everything." Jerger also took the police to the dirt road where the victim had been killed and to the property on Lead Mine Valley Road where they had dug the hole. Jerger noticed that the Impala was still on the property.

At the conclusion of Jerger's testimony, he reiterated that the Appellant shot the victim. He said that he did not know how many times the Appellant shot the victim but that the Appellant fired three gunshots. The Appellant was the only person with a weapon on October 11, 2015.

On cross-examination, Jerger acknowledged that he agreed to "stall" Sivley at the compound until the Appellant could get there and said that the Appellant "assaulted" Sivley at the compound. The bookbags Jerger used to lure Sivley to the compound contained electronics and guns that Sivley had taken from the Appellant. Jerger described the victim as "a rich boy" and "a target" and said, "Everybody robbed Tyler. . . . He didn't belong on them streets." Jerger acknowledged that the victim was his friend and said that he did not know the Appellant was angry with the victim when they went to pick up the victim on Green Drive. Jerger stated, "At that point, there was really no fear. . . . [The victim] thought he was just getting a ride." The Appellant did not physically force the victim into the Xterra but told the victim to get into the vehicle. The Appellant and the victim were friends too, and Jerger thought the Appellant was just going to scare the victim and "send him home so he'd have to go to rehab." Jerger stated, "Even after the first shot I assumed Jody was just trying to scare Tyler."

Jerger testified that at the time of the shooting, he was standing at the Xterra's rear bumper. The Appellant and the victim were toward the front of the Xterra, but Jerger could see the Appellant through the windshield. After the Appellant fired the first shot, "there was a little hesitation between the first and second shot." The Appellant fired the second and third shots "[b]ack to back." After the shooting, Jerger and Hawkins acted like the Appellant's friends so that he would not shoot them.

Defense counsel asked if Jerger was being held "hostage" on October 11, and Jerger responded, "At first before [the Appellant] pulled a gun on us, no. Then after he pulled a gun on us, yes." Jerger never saw Ashley or Crumley with a gun. He acknowledged describing Ashley as a "cold hearted [b*tch]" and said she did not appear upset after the victim's death.

Jerger acknowledged that in the hours after the shooting, he and Hawkins were alone in the BP gas station and the Impala. However, they did not ask the clerk for help, and

they did not try to drive away. Jerger said he and Hawkins did not attempt to flee from the Appellant because the Appellant "was in front of us, behind us, beside us, dictating where we went with a gun." Jerger stated that after the Appellant left them at the motel, Jerger told everyone about what had happened but that no one believed him. Jerger acknowledged that the victim was killed on Sunday and that the Appellant was arrested and jailed the next day for assaulting Sivley. Jerger did not go to the police after the Appellant's arrest, though, because Jerger thought Ashley was going to bail the Appellant out of jail. On Thursday, four days after the shooting, Jerger learned the Appellant was still in jail, but Jerger did not contact the police. Jerger said he did not think he did anything wrong on October 11.

Lieutenant David Shoemaker of the BCSO testified that he assisted the lead detective, Brandon Edwards, in this case. On October 15, 2015, Lieutenant Shoemaker learned that "R.L. Jerger [was] telling people that he had witnessed a murder." Lieutenant Shoemaker and other officers began looking for Jerger and found him that night. Jerger told the police "of a possible murder site on Hughes Lake Road" and led the officers to the scene. Lieutenant Shoemaker described Hughes Lake Road as "a really bad ruddy road through the middle of the woods." On October 19, 2015, Jeff Crumley came to the sheriff's office and met with Detective Dewayne Scoggins. Crumley led Detective Scoggins and Lieutenant Shoemaker to the "exact same" location on Hughes Lake Road, which was "just shy of the Georgia line."

Emily Dennison, the Assistant Medical Examiner for Davidson County, testified as an expert in forensic pathology that she performed the victim's autopsy in Nashville on October 18, 2015. The body, which was found in Polk County, was clothed, wrapped in a blue tarp, and "fairly badly decomposed." Dr. Dennison said the victim had a penetrating gunshot wound to the right side of his chest. The bullet traveled into his neck, fractured his collarbone, and struck "some major vessels" in his neck. Dr. Dennison recovered the bullet in the victim's left armpit. The victim had a second penetrating gunshot wound to the back of his right shoulder. The bullet traveled into the right side of his chest, fractured one rib, traveled through the top of his right lung, and lodged in the victim's left collarbone. Dr. Dennison collected samples of the victim's liver for toxicology testing, and testing revealed amphetamine and methamphetamine in the victim's system. She also collected a white powdery substance that was in the victim's clothing. Dr. Dennison did not find any soot or stippling on the victim's skin or clothing, indicating that the gun was not close to the victim when it was fired. Dr. Dennison concluded that the victim's cause of death was multiple gunshot wounds and that his manner of death was homicide. Upon being questioned by the trial court, Dr. Dennison testified that the victim may have had blood in his mouth after the shooting.

Thirty-three-year old Gus Hawkins testified that he suffered a head injury as a child and that the injury affected his ability to remember "certain things." About one week before the victim's death, Hawkins sold a nine-millimeter handgun to Nick Parker for fifty

dollars. Hawkins had obtained the gun from Jonathan Sivley. On October 11, Hawkins and the victim were at an apartment on Green Drive. The Appellant came into the apartment and talked with the victim. The Appellant wanted his gun back, so Hawkins and the victim left with the Appellant. They got into the Appellant's Xterra, and Ashley drove them to the Econo Lodge. The Appellant was sitting in the front passenger seat, R.L. Jerger was sitting behind the Appellant, Hawkins was sitting behind Ashley, and the victim was sitting between Hawkins and Jerger.

Hawkins testified that he and the Appellant went upstairs to Parker's motel room. The Appellant got his nine-millimeter chrome Jennings handgun from Parker and asked to borrow Parker's black .40-caliber handgun. After the Appellant obtained the guns, he and Hawkins returned to the Xterra. The Appellant and the victim began arguing about "stuff" that had been stolen from the Appellant, and the Appellant was acting "[v]ery hostile" toward the victim. Hawkins said that the Appellant "had the gun pointed in the back seat toward us" and that the Appellant said that "someone's gonna die today."

Hawkins testified that Ashley drove to her grandparents' house. Her grandfather was home, so she drove to Hughes Lake Road. The Appellant forced Hawkins, Jerger, and the victim to get out of the Xterra and lined them up beside the vehicle on the driver's side. The Appellant was still holding the nine-millimeter handgun. He searched them and told the victim "to walk out first." The victim kept saying that he wanted to go home, and the Appellant threatened to kill the victim. The victim "took off" toward the front of the Xterra, and the Appellant "pulled the hammer back" and fired three shots at the victim. Hawkins said the Appellant fired the shots "[b]ack, to back, to back. Pow! Pow! Pow! That's exactly how it went."

Hawkins testified that the victim fell and that blood was in his mouth. The Appellant and Jerger wrapped the victim in a blue tarp and "took him off the side of the embankment." They left the scene, and Jerger disassembled the chrome gun that the Appellant had used to shoot the victim. Hawkins said the Appellant threatened to kill Hawkins's younger brother if Hawkins told anyone about the shooting.

Hawkins testified that they met the Appellant's mother at Taco Bell and that the Appellant put a bookbag into the trunk of her car. They also met with Crumley, went to the Appellant's storage unit to get shovels, and went to Ace Hardware. They went to Home Depot and Lowes and "stopped at Hardees." Hawkins said that the Appellant's "plan" was to get rid of the victim's body, so they returned to Hughes Lake Road and "loaded the body in the back of an Impala." They drove the body to "Jeff Crumley's family's house," and Crumley, the Appellant, and Jerger dug a hole. The Appellant then drove Hawkins and Jerger to the Diplomat motel and paid for their room.

Hawkins testified that at some point after the victim's death, he and Jerger were alone in the Impala and that they were "trying to think of a way to escape out of there."

Hawkins and Jerger thought they were "gonna die" because they had witnessed the shooting, and Hawkins "was just trying to do everything [he] could do and stay alive at that time." Hawkins said that he did not remember ever saying that he shot the victim and that he did not believe Jerger had anything to do with the victim's death. He stated, "That's just not in [Jerger's] blood. . . . Does he do meth? Does he, you know, steal? Yeah. He's done that to me, but he would never have anything to do with this. It's not him." Hawkins had not met Crumley prior to October 11.

On cross-examination, Hawkins acknowledged giving a statement to police on October 16, 2015, and telling them that he could remember "very little" about the shooting. He said "being sober in a place where [he could] think" helped him remember and that Dusty Cox, who was in the apartment on Green Drive with Hawkins and the Appellant on October 11, "reminded me of what happened." Hawkins said he spoke with Cox in December 2015 when they were in jail together.

Hawkins testified that after the Appellant obtained the guns from Parker, the Appellant "click[ed] the guns together at the top of the motel stairs "[b]efore he walked down the staircase." Prior to the shooting, the victim appeared to be afraid and was crying. Hawkins said he did not remember the victim's asking Jerger for help or Ashley's saying after the shooting that "this couldn't have happened to a better person." The Appellant fired three shots at the victim, and "[t]he last two shots were closer together than the first one." Hawkins acknowledged that after the shooting, he and Jerger went into the BP gas station and that they did not ask for help. Hawkins also acknowledged that he did not go to the police after the shooting. He said that he sent his father to the police department and that he was scared for his life and the life of his brother.

Jeff Crumley testified that in October 2015, he and the Appellant were friends. Crumley used methamphetamine, and he met the victim through the Appellant. Crumley would see the victim at the Appellant's house "most of the time," and occasionally the victim would accompany the Appellant to Crumley's house. Crumley said he last used methamphetamine about one month before the Appellant's trial.

Crumley recalled an incident about two weeks before the victim's death in which Sivley, the victim, and the Appellant were in Crumley's basement. Crumley testified that the Appellant was "pretty mad" and that the Appellant asked Sivley and the victim if they had stolen anything from the Appellant. The victim admitted taking a backpack, and the Appellant "elbowed him in the mouth." The victim's lip was "busted" and "bled pretty good." The Appellant also slapped Sivley's face. Crumley did not see Sivley or the Appellant again.

Crumley testified that about 3:00 p.m. on October 11, 2015, he received a telephone call from the Appellant. The Appellant said he "needed some help" and "wanted to borrow a truck," so Crumley drove to Taco Bell. A black car and the Appellant's Xterra were

- 10 -

there. The Appellant got out of the Xterra, went to the passenger side of Crumley's truck, and "set something wrapped up in a towel in the passenger seat, and told [Crumley] to put it up for him." The items in the towel turned out to be a computer and a black handgun. Crumley drove home and put the items in his basement.

Crumley testified that about one hour later, the Appellant telephoned and asked to meet Crumley at a gas station on Highway 60. Crumley went to the gas station, and the Appellant got into his truck. The Appellant telephoned Sivley. The Appellant told Sivley that he did not assault Sivley and that Sivley should tell the police that Sivley did not want to "press charges" against the Appellant. At some point, Hawkins and Jerger got out of the Appellant's Xterra and got into Crumley's truck. Crumley had never met them prior to October 11. The Appellant wanted to hide the Xterra, so Crumley drove to Lead Mine Valley Road, and Ashley followed in the Xterra. They took two shovels and a mattock out of the Xterra; went into the woods; and Crumley, Jerger, and the Appellant began digging a hole. Crumley asked the Appellant what had happened, but the Appellant told him that he did not need to know. Crumley "knew something bad had happened."

Crumley testified that everyone got into his truck, that they left the Xterra on Lead Mine Valley Road, and that the Appellant told him to drive to Hughes Lake Road. During the drive, the Appellant told Crumley that he "shot someone." Hawkins, who was sitting in the back seat, responded, "[Y]ou know Jody, you didn't do it, I did." Crumley told the jury that he did not believe Hawkins and that he thought Hawkins was "trying to get on someone's good side."

Crumley testified that they drove to Hughes Lake Road, Lowes, and Home Depot. They stopped to get a silver Impala and drove both vehicles back to Hughes Lake Road. Everyone got into the Impala, and Crumley drove on Hughes Lake Road until the Appellant told him to stop. Jerger and Hawkins went into the woods and returned with a body wrapped in a blue tarp. Crumley said that "they had to lay the seats down" in order to get the body into the trunk. They drove the Impala back to his truck and drove both vehicles back to Lead Mine Valley Road. The Impala got "stuck" in the mud on Lead Mine Valley Road. Everyone got into the Xterra, and they drove Jerger and Hawkins to a motel.

Crumley testified that he, the Appellant, and Ashley stopped at the Appellant's "old residence" and that the Appellant got into a white Chevrolet Blazer. They drove the Blazer and the Xterra to Crumley's house, and the Appellant and Ashley got out of the Xterra and into a white Hyundai Elantra. They then drove the Blazer and the Elantra to Lead Mine Valley Road and moved the body from the trunk of the Impala into the back seat of the Blazer. Crumley cut the carpet out of the Impala's trunk and poured bleach into the trunk.

Crumley testified that at 5:00 a.m., he, the Appellant, and Ashley drove the Blazer and the Elantra to Walmart. They went inside and bought a chain to pull the Impala out of the mud, a "dolly" to move the victim, shower curtains, and Gorilla Tape. They then drove

both cars back to Crumley's house.  Crumley left in the Blazer, with the victim's body still in the back seat, and drove to a gravel road in the Greasy Creek area.  He pulled to the side of the road and tried to carry the victim "down the slope" but fell.  Crumley "said a prayer over" the victim.  Crumley said he intentionally took off a Chevrolet hat he was wearing and left it at the scene.

Crumley testified that he later saw Ashley and that she told him the Appellant had been arrested.  Crumley washed the outside of the Blazer and drove it back to his home.  It remained there "[a]bout a day or so" until Ashley drove it back to her and the Appellant's "old residence."  About three days later, the Appellant's mother and a man drove the Blazer to Crumley's house, and Crumley gave the Appellant's mother the black gun that the Appellant had put on Crumley's passenger seat.  Crumley said he ultimately led the police to the victim's body.  He also took the police to the scenes on Hughes Lake Road and Lead Mine Valley Road.

On cross-examination, Crumley acknowledged that Jerger and Hawkins seemed to be "pretty good friends" with the Appellant and that they seemed to trust the Appellant.  Jerger, Hawkins, and Ashley did not show any remorse for the victim's death, and the Appellant did not point a gun at anyone while they were digging the hole on Lead Mine Valley Road.  Crumley said that he did not know who shot the victim and acknowledged that the State was going to dismiss the charges against him if he told the truth.

Twenty-two-year-old Ashley Hughes testified that she married the Appellant in June 2015 and that she was scared of him because he was abusive.  In October 2015, Ashley was twenty-one years old and addicted to methamphetamine.  At the time of the Appellant's trial, she was five months pregnant.  She said she had not used methamphetamine for almost one year.

Ashley testified that the victim used drugs with her and the Appellant.  Sivley and the Appellant were friends, and Ashley saw Sivley and the victim almost every day.  About one week before the victim was killed, Savannah Sullivan told Ashley and the Appellant that the victim had stolen methamphetamine from the Appellant.  The Appellant was "pissed off."

Ashley testified about the incident that occurred in Jeff Crumley's basement.  She said that a couple of days before the victim's death, she and Crumley's girlfriend were upstairs.  They heard a scream, so Ashley went downstairs to find out "what was going on."  The victim was covering his nose, which had been "busted."  On October 11, Ashley and the Appellant were in Chattanooga, and the Appellant spoke with Jerger on the telephone. The Appellant and Jerger were friends, and Jerger told the Appellant that Sivley was at Jerger's house.  Jerger agreed to keep Sivley there, so Ashley drove the Appellant to the compound in Cleveland.  Sivley saw the Appellant's Xterra and "took off running behind the compound."  The Appellant and Jerger chased Sivley, but Sivley kicked in the

door of a house. Someone called the police, so Ashley, the Appellant, and Jerger left the compound.

Ashley testified that Jerger received a text from the victim. The victim wanted Jerger to pick him up, so Ashley drove to an apartment on Green Drive. The Appellant and Jerger went into the apartment for ten to fifteen minutes and came out with Hawkins and the victim. Ashley stated that "[t]hey . . . was telling [the victim] to get in, . . . he didn't look like he wanted to, and he was basically . . . forced to get in." She said that the victim was "cornered" and that he had "no other choice but to get in the [Xterra]."

Ashley testified that she drove to the Econo Lodge and that the Appellant was sitting in the front passenger seat. Hawkins was sitting behind the Appellant, Jerger was sitting behind Ashley, and the victim was sitting between Jerger and Hawkins. The Appellant, Hawkins, and the victim went into Nick Parker's room. When they returned to the Xterra, the Appellant had two guns: a silver gun and a black gun. The Appellant was angry at the victim for stealing methamphetamine and told Ashley to drive to her "papaw's." The Appellant pulled out one of the guns, pointed it at the victim, and asked the victim "which one did he want to be killed with." The victim was scared and wanted to go home. When Ashley got to her grandfather's house, her grandfather was there, so they left. She said that a couple of weeks prior to October 11, the Appellant had talked about shooting the victim "at [her] papaw's."

Ashley testified that the Appellant, Jerger, and Hawkins were "all hopping on [the victim] about stuff that he stole from 'em" and that they ended up on Hughes Lake Road. The Appellant told her to turn onto a dirt road; told her where to stop the Xterra; and told Jerger, Hawkins, and the victim to give him their telephones. He told everyone in the back seat to get out, and the four of them went to the back of the Xterra while Ashley remained in the vehicle. She said that the Appellant was holding the silver gun, that the victim was crying, and that the Appellant was yelling at the victim. Ashley heard the victim scream and heard a gunshot. The victim ran to the driver's side and "rolled on top of the car hood." The victim looked like he had been shot. He fell by the passenger side front tire, and the Appellant "stood over him and shot him twice. Back to back."

Ashley testified that the victim "had blood running out of his mouth" and that she did not see him move again. The Appellant told Jerger and Hawkins to put the victim's body in a tarp, so Jerger and Hawkins rolled the victim into the tarp and dragged the tarp into "a patch of trees." The Appellant, Jerger, and Hawkins got back into the vehicle, and Ashley drove out Hughes Lake Road. She said she never got out of the Xterra while they were on Hughes Lake Road.

Ashley testified that Hawkins disassembled the Appellant's gun and that they met the Appellant's mother at Taco Bell. They met Jeff Crumley at the Appellant's storage unit, got shovels out of the unit, and went to Lead Mine Valley Road because Crumley said

they could dig a hole there. The Appellant, Jerger, and Crumley dug a hole in a field, and they all went to Crumley's house to get the Impala. Ashley testified similarly to Jerger, Hawkins, and Crumley about going to Hardee's, returning to the scene of the shooting, putting the victim's body into the trunk of the Impala, and returning with the body to Lead Mine Valley Road. She said they also went "quite a few places" such as Ace Hardware and Home Depot, and she identified surveillance photographs of her and Crumley in Home Depot. They stopped at Dollar General, and the Appellant and Hawkins went inside and bought bleach. They left Hawkins and Jerger at a motel, and the Appellant and Crumley transferred the body from the Impala to the Blazer. The Appellant, Ashley, and Crumley went to Walmart, and Ashley identified photographs that showed them buying items. Ashley said that last time she saw the Blazer with the victim's body in it was at Crumley's house. Crumley told Ashley and the Appellant that he knew of a place to take the body, so he left in the Blazer. The next day, the Appellant's mother came to Crumley's house and got the Blazer. Ashley said that the Appellant shot the victim and that she had not been promised anything in exchange for her testimony.

On cross-examination, Ashley acknowledged that when they went to the Econo Lodge to get the guns from Nick Parker, Jerger and Hawkins were "willing participants." The Appellant did not click the guns together in the motel parking lot. Ashley acknowledged that she did not tell the police that the Appellant asked the victim, "Which gun to you wanna get killed with?" She denied saying after the shooting that "it couldn't have happened to a better person" and acknowledged that Jerger, not Hawkins, disassembled the Appellant's gun. Ashley also acknowledged that she, Jerger, and Hawkins had opportunities to escape from the Appellant after the shooting but that they did not do so. Ashley was charged with crimes related to the victim's death and spent several months in jail. However, she spoke with a detective and was released on bond. She acknowledged that she violated the conditions of her bond by having contact with the Appellant and his mother and by using illegal drugs. Despite the violations, her bond was not revoked. Ashley said that the Appellant was "a very angry person" and that she "knew better" than to go against him. Therefore, she did not tell the Appellant not to hurt the victim. She said she was testifying "[f]or the truth to be out."

On redirect-examination, Ashley testified that on October 11, 2015, the Appellant was wearing a GPS monitor on his ankle. On recross-examination Ashley testified that she never saw the Appellant tamper with the monitor.

Beryl Paul, Jr., testified that on October 16, 2015, officers from the BCSO came to his house to inquire about a Chevrolet Blazer. The vehicle belonged to the Appellant, but the Appellant's mother had loaned the Blazer to Paul on October 14 because Paul did not have a vehicle. A mattock and two shovels were in the vehicle when Paul obtained it. On cross-examination, Paul testified that the Appellant's mother did not ask him to conceal evidence.

Special Agent Laura Hodge of the Tennessee Bureau of Investigation (TBI) Crime Laboratory testified as a firearms and tool mark expert that the two bullets recovered from the victim were fired from the same nine-millimeter firearm. Michael Turbeville, a Special Agent Forensic Scientist with the TBI, testified as an expert in DNA analysis that DNA on a cigarette butt found on Hughes Lake Road matched Crumley and that DNA on a Gatorade bottle found on Lead Mine Valley Road matched Hawkins. DNA on cigarette butts collected from the Impala matched the Appellant, Ashley, and an unknown female. The victim's blood was on a seat belt buckle in the back seat of the Blazer.

Monica Datz, a crime scene investigator and latent print examiner for the BCSO, testified as an expert in fingerprint and palm print examinations that fingerprints in Crumley's truck matched Ashley and Jerger. Fingerprints in the Appellant's Blazer matched Sivley, the Appellant, Ashley, and Beryl Paul. Fingerprints in the Impala matched the Appellant. A fingerprint in the Elantra matched Crumley, and a fingerprint in the Xterra matched Ashley. Carpeting had been removed from the Impala's trunk, and the trunk had a "very strong smell of bleach." On cross-examination, Datz acknowledged that it would not have been unusual for the Appellant's fingerprints to have been in the Appellant's vehicles.

Shane Clark, a crime scene technician for the Cleveland Police Department, testified that he assisted the BCSO in processing evidence where the victim's body was recovered. The body was wrapped in a tarp and was found "down a ravine on a road on Kimsey Mountain." West Polk Fire and Rescue loaded the body into a rescue basket and pulled the basket to the top of the ravine with a winch. A baseball cap with a "Chevy bow tie" on the front was on a trail near the body.

Detective Brandon Edwards of BCSO testified that on Thursday, October 15, 2015, he received information that the Appellant had killed the victim. Detective Edwards also learned that the victim's father had reported the victim missing just a couple of hours earlier and that Jerger was claiming he had witnessed the killing. Officers began looking for Jerger and brought him to the sheriff's office. Jerger was "very scared" when the police found him but gave the police "all the details from his vantage point." He also took the police to Hughes Lake Road and showed them where he saw the Appellant shoot the victim. Jerger then directed the police to Lead Mine Valley Road where the police saw a silver Impala stuck in mud in a field. Jerger kept telling the officers that the victim's body was in the trunk of the Impala.

Detective Edwards testified that the police began looking for Hawkins, Crumley, and Ashley and found them on Friday, October 16. Detectives began interviewing them, visiting various stores, and collecting surveillance video. Detective Edwards learned that on October 11, the Appellant used his bank debit card at Ace Hardware, Hardee's, Walgreens, and a gas station in Georgia. Detective Edwards spoke with the Appellant on October 16, and the Appellant said he knew the victim. The Appellant claimed that he

picked up the victim on Green Drive on October 11, that he drove the victim to the compound, and that he "let [the victim] out." Detective Edwards confronted the Appellant with information that the victim had been killed. The Appellant assured Detective Edwards that the victim was alive.

Detective Edwards testified that in October 2015, the Appellant was wearing a GPS ankle monitor, which helped establish a timeline for the events on October 11 and 12. Specifically, the Appellant's ankle monitor showed as follows: On the morning of October 11, the Appellant traveled from Chattanooga to Cleveland. At 12:54 p.m., the Appellant was in "the area referred to as the compound." Detective Edwards noted that Sivley telephoned 911 from the compound about 1:00 p.m. At 1:25 p.m., the Appellant was on Green Drive for one minute. However, he was on Pike Drive, near the apartment on Green Drive, for about five minutes. The Appellant was at the Econo Lodge on Westside Drive from 1:32 p.m. to 1:36 p.m. and then traveled to "Ashley's papaw's house" on Poindexter Drive. At 1:59 p.m., the Appellant's "GPS [went] dead for whatever reason for a long time."

Detective Edwards testified that when the Appellant's GPS "began to pick back up," it showed that the Appellant was at Ace Hardware at 4:43 p.m. and at an address on Lead Mine Valley Road from 5:57 to 6:27 p.m. Detective Edwards noted that the police found the Impala and a hole in the ground at that same address. At 6:43 p.m., the Appellant was in the area of the Hardee's on Spring Place Road. He was still on Spring Place Road at 7:25 p.m, but the GPS "[went] out again" until 7:53 p.m. The Appellant was at Home Depot about 8:15 p.m., Dollar General at 8:50 p.m., and the Family Pit Stop about 9:30 p.m. The Appellant was at Walgreens about midnight, Walmart about 4:30 a.m., and the Kangaroo gas station about 5:00 a.m.

Detective Edwards identified video showing Crumley's truck, with shovels in the bed of the truck, at Hardee's and video showing the Appellant, Crumley, Hawkins, Jerger, and Ashley inside Hardee's. He also identified video showing the Appellant and Hawkins inside Dollar General at 8:49 p.m.; a receipt showing they purchased several items in Dollar General, including bleach; and video showing the Appellant, Ashley, and Crumley inside Walmart buying latex gloves, Gorilla Tape, and a green "dolly." Detective Edwards said Jerger and Crumley "pointed out" a dirt trail on Hughes Lake Road. Officers looked for shell casings and the victim's telephone on Hughes Lake Road but did not find the items.

On cross-examination, Detective Edwards acknowledged that Jerger claimed he was forced to participate in the events leading to the victim's death. Jerger and Hawkins claimed they were "hostages" and afraid of what would happen if they opposed the Appellant. However, Jerger and Hawkins did not appear to be in distress in Hardees, and Hawkins did not appear to be in distress in Dollar General. At first, Hawkins claimed he was at the Econo Lodge with Nick Parker on October 11. Hawkins later told Detective Edwards that he was with the victim at the apartment on Green Drive. Hawkins's account

of the events on October 11 was chronologically incorrect, and Hawkins may have claimed that the Appellant used a gun to force the victim into the Xterra on Green Drive, a time when the Appellant did not have a gun. Detective Edwards said Hawkins did not remember going to Taco Bell and "had to be reminded" of some events to "jog" his memory. Nevertheless, Hawkins "remembered the major details of what had happened." Detective Edwards acknowledged that he spoke with Ashley and that he was present when she testified at the Appellant's preliminary hearing. Detective Edwards did not remember Ashley ever saying that the Appellant asked the victim, "[W]hich gun do you want me to kill you with[?]"

On redirect-examination, the State asked Detective Edwards to explain how the statements of Jerger, Hawkins, Crumley, and Ashley were consistent. Detective Edwards said that the witnesses "absolutely never wavered" from their claims that the Appellant had a chrome gun and a black gun, that the Appellant was the only person with a gun on Hughes Lake Road, and that the Appellant fired three shots at the victim. At the conclusion of Detective Hughes's testimony, the State rested its case.

Stephanie Anderson testified that she had known Ashley Hughes for five or six years and that they were friends. In July 2016, Anderson and Ashley went swimming. Anderson told Ashley, "[W]ell you know they say that you was the one who pulled the trigger." Ashley did not deny that she shot the victim.

On cross-examination, Anderson testified that she knew the Appellant's mother "[v]ery well." Anderson acknowledged that she was in jail and that she had communicated with the Appellant's mother while she was in jail. Anderson stated that she had written letters to the Appellant's mother and that "I'd write and tell her I love her and I miss her, and I'm praying for this whole situation."

The twenty-eight-year-old Appellant testified that he had prior convictions of introducing contraband into a penal facility, felony vandalism, robbery, and attempted robbery. The Appellant knew the victim about ten years, and they were "pretty good" friends. In 2015, the Appellant was released from jail and began selling drugs. The victim used drugs, so their friendship "turned into more on a daily basis of [the victim] coming to buy drugs [from the Appellant]." The Appellant saw the victim "pretty much" every day. The Appellant also worked as a pipefitter but was "laid off" in July 2015.

The Appellant testified that Savannah Sullivan told him that the victim had stolen "dope" from him. The Appellant confronted the victim at Jeff Crumley's house, and the victim admitted stealing drugs. The Appellant asked the victim if the victim had bragged about the theft. The victim told the Appellant no, which the Appellant knew was a lie, so the Appellant punched the victim in the nose. After the incident, the Appellant was not angry with the victim.

The Appellant testified that on Sunday, October 11, he was in Chattanooga and received a telephone call from Jerger. The Appellant knew Jerger through the victim and had sold drugs to Jerger. Jerger told the Appellant that Sivley was at Jerger's house and that Sivley "had two backpacks full of electronics and stuff." Jerger offered to keep Sivley there, so Ashley drove the Appellant back to Cleveland. When they arrived at the compound, the Appellant saw Sivley with the Appellant's backpacks. The Appellant jumped out of the Xterra and ran to Sivley. Sivley tried to run from the Appellant, but Jerger hit Sivley on the back of the head. Sivley dropped the backpacks he had been carrying, "dove over" a fence, and "barreled" into the back door of a house. The Appellant and Jerger stopped chasing Sivley because they knew the police were coming. The Appellant grabbed his backpacks, he and Jerger got into the Xterra, and Ashley drove them away from the scene. The Appellant did not force Jerger to get into the Xterra.

The Appellant testified that the victim texted Jerger, asking for a ride. Jerger told the Appellant that the victim had the Appellant's guns, so they went to the apartment on Green Drive. The Appellant and Jerger went into the apartment, and the Appellant yelled at the victim. Hawkins, who also was in the apartment, told the Appellant that Hawkins had sold the Appellant's nine-millimeter gun to Nick Parker. The Appellant, Jerger, Hawkins, and the victim got into the Xterra, and Ashley drove them to the Econo Lodge. The Appellant and Hawkins went to Parker's room, and the Appellant got two guns from Parker. The Appellant put one of the guns into his waistband and gave the other gun to Hawkins. When the Appellant and Hawkins returned to the Xterra, Jerger was yelling at the victim and accusing the victim of "robb[ing]" Jerger.

The Appellant testified that Ashley said she was going to drive to her papaw's house and that nobody would be there. When they arrived, Ashley said that her papaw was not at home, but she backed out of the driveway anyway. They "drove around" and ended up on "[s]ome dirt road." Ashley stopped on the dirt road, and the Appellant, Jerger, Hawkins, and the victim got out of the Xterra. The four of them walked about thirty feet behind the vehicle. The Appellant and Jerger each had a gun, and Jerger pointed his gun at the victim. The Appellant thought Jerger was going to scare the victim. The victim was scared because Jerger was angry that the victim had stolen "some stuff" from Jerger. The victim ran, and Jerger pulled the trigger, shooting the victim in the back of his right shoulder. The victim fell but stood up. He turned around toward them, and Jerger shot the victim again. Jerger fired only two shots.

The Appellant testified that he did not know Jerger was going to shoot the victim and that he pulled his gun out of his waistband. The Appellant demanded Jerger's gun, took the bullets out of the gun, and gave the gun back to Jerger. The victim was not moving, so the Appellant knew the victim was dead. The Appellant had a GPS monitor on his leg and told everyone that "we're all going down for this." The Appellant said he never tampered with the monitor.

- 18 -

The Appellant testified that Jerger and Hawkins put the victim's body in a tarp and pulled the tarp into the woods. Jerger "broke down" the gun and threw it out the window "piece by piece." The Appellant took "charge of the situation" and told them that he wanted to move the body. They met Crumley and the Appellant's mother at Taco Bell, and the Appellant told Crumley that he needed to borrow Crumley's truck. He also gave his gun to Crumley and gave his mother the two bags he had obtained from Sivley. The Appellant did not tell his mother what had happened but told her that "it wasn't me" and "pointed at them."

The Appellant testified that "the plan was to get [the body] away from my GPS location." They decided to bury the body, so they went to the Appellant's storage unit and got shovels. They then went to Ace Hardware, and the Appellant bought gloves and a mattock. They met Crumley at a BP gas station, and the Appellant told Crumley that "dude just shot dude." The Appellant told Crumley that he wanted to move the body, and Crumley said he would help the Appellant.

The Appellant testified that they drove to a property on Lead Mine Valley Road and dug a hole. However, the Appellant realized that the GPS monitor "put[]" him at that location, so he decided he did not want to bury the body there. Crumley offered to "take that body and . . . drop it off where none of us knew where it was at." The Appellant and Crumley decided they would "trick" Jerger and Hawkins to make them think the body was going to be buried on Lead Mine Valley Road.

The Appellant testified about obtaining the Impala, driving to Hughes Lake Road, and putting the body into the trunk of the car. They went to Hardee's, and the Appellant bought food for everyone. They went to Dollar General and returned to Lead Mine Valley Road. The Appellant gave drugs to Jerger and Hawkins and rented them a motel room. The Appellant, Ashley, and Crumley returned to Lead Mine Valley Road and moved the body from the Impala into the Appellant's Blazer. Crumley cut the carpet out of the Impala's trunk and poured bleach into the trunk. The Impala was "stuck" on Lead Mine Valley Road, so they left it there. They went to Walgreens and Walmart. Crumley left in the Blazer, and the Appellant and Ashley returned to Crumley's house. The Appellant said he did not shoot the victim.

On cross-examination, the Appellant acknowledged that much of the testimony given by the State's witnesses was true. For example, Savannah Sullivan told the Appellant that the victim stole drugs from the Appellant, and the Appellant assaulted the victim at Crumley's house. Moreover, on October 11, the Appellant went to the compound, went to the apartment on Green Drive, obtained two guns from Parker at the Econo Lodge, and met his mother at Taco Bell after the shooting. He said, though, that the witnesses "lied all the way around [about] what they did and what they didn't do, and what their involvement was." The Appellant said Ashley was the one who wanted him to go to the compound on October 11 to get his property back from Sivley. Jerger, not the Appellant, hit Sivley at

- 19 -

the compound. When the Appellant and Hawkins came out of Parker's room, the Appellant had the .40-caliber handgun, and Hawkins had the nine-millimeter handgun. Jerger, not the Appellant, shot the victim, and Ashley lied about seeing the Appellant walk up to the victim and shoot him. The Appellant said that at the time of his trial, Ashley was pregnant by another man but that he still loved her.

The Appellant acknowledged that he spent "hours and hours covering up someone else's murder." He said that he helped dispose of the victim's body "to save [his] own skin" and that the "best plan" was to let Crumley "be the only one who knew where the body was."

On redirect-examination, the Appellant denied forcing the victim out of the apartment on Green Drive or forcing the victim into the Xterra. Before the shooting, Jerger accused the victim of being a thief and told the victim that he was going to teach the victim a lesson. Jerger and Hawkins were never hostages, and Ashley "encourage[d] everything." The Appellant said Ashley could not have seen the shooting because it occurred behind the Xterra.

At the conclusion of the proof, the jury found the Appellant guilty as charged in the indictment of first degree premeditated murder; kidnapping, a Class C felony; tampering with evidence, a Class C felony; and conspiracy to commit tampering with evidence, a Class D felony. After a sentencing hearing, the trial court sentenced him to life for the murder conviction and as a Range II, multiple offender to six years for kidnapping, eight years for tampering with evidence, and eight years for conspiracy to commit tampering with evidence. The trial court ordered that the Appellant serve the two eight-year sentences concurrently but that he serve the life, six-year, and effective eight-year sentences consecutively for a total effective sentence of life plus fourteen years.

A. Sufficiency of the Evidence

The Appellant claims that the trial court erred by denying his motion for judgment of acquittal and that the evidence is insufficient to support his convictions of first degree premeditated murder and kidnapping. In a related argument, the Appellant claims that the trial court erred by failing to determine that Jerger, Hawkins, and Ashley were accomplices as a matter of law and that there was insufficient evidence to corroborate their testimony. The State argues that the evidence is sufficient and that the trial court did not err by failing to determine that the witnesses were accomplices as a matter of law. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S.

307, 319 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). "The standard by which the trial court determines a motion for judgment of acquittal at the end of all the proof is, in essence, the same standard which applies on appeal in determining the sufficiency of the evidence after a conviction." State v. Thompson, 88 S.W.3d 611, 614-15 (Tenn. Crim. App. 2000).

A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting Marable v. State, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

First degree murder is the premeditated and intentional killing of another person. Tenn. Code Ann. § 39-13-202(a)(1). A premeditated killing is one "done after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d). Kidnapping is false imprisonment "under circumstances exposing the other person to substantial risk of bodily injury." Tenn. Code Ann. § 39-13-303(a). False imprisonment occurs when a person "knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." Tenn. Code Ann. § 39-13-302(a).

The Appellant claims that the evidence is insufficient to support the convictions because Jerger, Hawkins, and Ashley gave "vastly different accounts of the shooting" and were not credible. He also contends that the evidence is insufficient to support the kidnapping conviction because the proof shows that the victim got into the Xterra willingly and because none of the witnesses testified that the victim was being held against his will.

Taken in the light most favorable to the State, the evidence shows that on October 11, 2015, the Appellant was angry with the victim because the victim had stolen drugs and

property from him. After the incident with Sivley at the compound, the victim texted Jerger, asking for a ride. The text informed Jerger and the Appellant of the victim's whereabouts. Ashley drove the Appellant and Jerger to the apartment on Green Drive so that the Appellant could confront the victim about the thefts. The Appellant told the victim to get the victim's "stuff" and threatened to "smack" the victim. The victim left the apartment with the Appellant and Jerger. Although Jerger testified that the victim "thought he was just getting a ride" and that the Appellant did not force the victim into the Xterra, Jerger also testified that the Appellant told the victim to "get the 'F' in the car before I smack the [sh*t] out of you." Ashley testified that the victim was "cornered" and "basically forced" to get into the vehicle. Regardless, when the Appellant later turned to the back seat and pointed his gun at the victim, the victim obviously was confined and not free to leave the Xterra. Jerger, Hawkins, and Ashley testified that the victim was scared, crying, and kept saying he wanted to go home. However, instead of taking the victim home, the Appellant told Ashley to drive to her papaw's land and then Hughes Lake Road. Jerger, Hawkins, and Ashley all testified that the Appellant shot the victim on Hughes Lake Road. The jury, not this court, was in the best position to judge their credibility, and the jury obviously accredited the testimony of at least one of them regarding the Appellant's being the shooter. Moreover, the evidence is sufficient to show that the Appellant substantially interfered with victim's liberty prior to the shooting. Accordingly, the evidence is sufficient to support the Appellant's murder and kidnapping convictions.

As to the Appellant's claim that Jerger, Hawkins, and Ashley were accomplices as a matter of law, defense counsel argued during his motion for judgment of acquittal that the trial court should designate Jerger, Hawkins, and Ashley as accomplices. The trial court ruled that the jury should determine whether they were accomplices and that the evidence sufficiently corroborated their testimony. During the final jury charge, the trial court instructed the jury that it must determine whether Jerger, Hawkins, and Ashley were accomplices and, if so, whether their testimony was supported by other evidence.[2] Defense counsel asserted during his closing argument that the three witnesses were accomplices.

An accomplice is someone who "knowingly, voluntarily, and with common intent participates with the principal offender in the commission of the crime alleged in the charging instrument." State v. Griffis, 964 S.W.2d 577, 588 (Tenn. Crim. App. 1997). If the facts about the witness' participation in the crime are clear and undisputed, the trial court should determine as a matter of law whether the witness was an accomplice. State v. Allen, 976 S.W.2d 661, 666 (Tenn. Crim. App. 1997). However, if the facts are disputed or subject to different inferences, the jury should determine as a question of fact whether the witness was an accomplice. State v. Anderson, 985 S.W.2d 9, 16 (Tenn. Crim. App. 1997). Generally, the question of a witness' status as an accomplice is answered by

_____

[2] We note that the trial court instructed the jury that Crumley was an accomplice in the alleged crimes of tampering with evidence and conspiracy to commit tampering with evidence.

- 22 -

determining whether that person could have been indicted for the charged offense. State v. Boxley, 76 S.W.3d 381, 386 (Tenn. Crim. App. 2001).

In Tennessee, a felony conviction may not rest solely upon the uncorroborated testimony of an accomplice. Id. Moreover, one accomplice cannot corroborate another. Id. Corroboration exists when there is some evidence, independent of the accomplice's testimony, which suggests not only that a crime has been committed but that the accused committed the crime. State v. Shaw, 37 S.W.3d 900, 903 (Tenn. 2001). "'This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction.'" Id. (quoting State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994)). Ordinarily, it is up to the jury to determine whether sufficient corroboration exists. Id.

Turning to the instant case, it was undisputed that Jerger, Hawkins, and Ashley were present when the victim was killed. However, all three of them claimed that the Appellant alone possessed a firearm, that the Appellant alone shot the victim, and that they did not interfere because they were afraid of the Appellant. In our view, the issue of whether Ashley was an accomplice as a matter of law was a closer question than that of Jerger and Hawkins. Ashley, who was charged with facilitation of first degree premeditated murder, knew on October 11 that the Appellant was angry with the victim because the victim had stolen methamphetamine from him and that the Appellant had talked about shooting the victim "at [her] papaw's." Nevertheless, she drove the Appellant to the apartment on Green Drive so that he could confront the victim, drove the Appellant to the Econo Lodge so that he could obtain guns from Parker, and drove the Appellant and the victim to her grandfather's property. Ashley also testified, though, that the Appellant was abusive, that she was afraid of him, and that she "knew better" than to go against him. We note that Sivley testified that it was "common knowledge" the Appellant was dangerous. The trial testimony of Jerger, Hawkins, and Ashley was far from clear or undisputed regarding their role in the crimes. Therefore, we agree with the trial court that the determination of whether they were accomplices was a question of fact for the jury.

In any event, even if some or all of the witnesses were accomplices as a matter of law, the evidence overwhelmingly corroborated their testimony. Parker testified that he gave the Appellant two handguns prior to the shooting and that one of those guns was a chrome nine-millimeter firearm. The two bullets recovered from the victim were fired from the same nine-millimeter gun. Moreover, the Appellant's GPS ankle monitor provided a detailed timeline of his whereabouts on October 11 and 12. The timeline corroborated the witnesses' testimony about where they went before, during, and after the shooting. The monitor stopped transmitting information twice on October 11, and the interruptions corresponded to the time that the victim was killed on Hughes Lake Road and to the time when the Appellant, Jerger, Hawkins, Ashley, and Crumley returned to Hughes Lake Road to retrieve the victim's body. Finally, the State introduced into evidence numerous videos and photographs that showed the Appellant and the witnesses in

- 23 -

Hardee's, Ace Hardware, Home Depot, and Walmart.  In sum, the evidence was more than sufficient to corroborate the testimony of Jerger, Hawkins, and Ashley.  Accordingly, the proof is sufficient to support the Appellant's convictions.

## B.  Self-Representation

The Appellant claims that the trial court erred by refusing to grant his "numerous requests to fire counsel and represent himself."  The State argues that only two incidents could be construed as requests to represent himself and that the trial court properly denied both requests.  We agree with the State.

Our review of the trial record reflects a contentious relationship between defense counsel and the Appellant.  During the Appellant's seven-day trial, he frequently complained to the trial court about defense counsel.  Specifically, the Appellant complained that defense counsel was unprepared, that defense counsel was not asking questions on cross-examination that the Appellant wanted him to ask, and that defense counsel was ignoring the Appellant during defense counsel's cross-examination of the witnesses.  On the last day of trial, the Appellant even contended that defense counsel was "purposely and intently" trying to destroy the Appellant's case.  However, our review also shows only two incidents that could be construed as the Appellant's requesting to represent himself.  The first incident occurred on the third day trial.  The Appellant asked the trial court, "Is it safe to still place [defense counsel] as an armchair Counsel, and me represent myself?  Is that still an option?"  The trial court denied the request, in part, because it was untimely, noting that "here we are in the middle of trial."  The second incident occurred on the fifth day of trial when the Appellant advised the trial court, "I don't want this man as my Lawyer. . . . I don't care if you appointed him.  I want to represent myself from this moment on.  I want to represent myself."  The trial court ruled that the Appellant's motion to remove defense counsel was untimely and did not address the Appellant's request to represent himself.

The United States Constitution and the Tennessee Constitution guarantee an indigent defendant the right to be represented by appointed counsel during a criminal trial.  See U.S. Const. amend. VI; Tenn. Const. art. I, § 9.  Likewise, "[j]ust as there is the right to the assistance of counsel at trial, there is the alternative right to self-representation." State v. Gillespie, 898 S.W.2d 738, 740 (Tenn. Crim. App. 1994); see also Faretta v. California, 422 U.S. 806, 819-20 (1975); State v. Small, 988 S.W.2d 671, 673 (Tenn. 1999).  "The right to represent oneself, however, should be granted only after a determination by the trial court that the defendant is both knowingly and intelligently waiving the valuable right to assistance of counsel."  Small, 988 S.W.2d at 673.

There are three essential prerequisites to activating the right of self-representation.  First, the right to proceed pro se must be timely asserted.  State v. Herrod, 754 S.W.2d 627, 629 (Tenn. Crim. App. 1988).  Second, the defendant's request to proceed pro se must be

clearly and unequivocally made. Id. at 630. Finally, the "accused must knowingly and intelligently waive the right to the assistance of counsel." Id. Additionally, Rule 44(b)(2) of the Tennessee Rules of Criminal Procedure provides that indigent defendants shall execute a written waiver of counsel. "The trial court's decision regarding the timeliness of the Defendant's request to represent himself made during trial rests within the discretion of the trial court." State v. David G. Jenkins, No. M2016-00270-CCA-R3-CD, 2017 WL 1425610, at *26 (Tenn. Crim. App. at Nashville Apr. 21, 2017) (citing State v. Michael Lewis, No. W2001-03121-CCA-R3-CD, 2003 WL 1697689, at *10 (Tenn. Crim. App. at Jackson, Mar. 26, 2003)).

Regarding the first request, the Appellant asked the trial court if it was still an "option" for him to represent himself, but the Appellant did not clearly and unequivocally state that he wanted to do so. In any event, the Appellant made the request on the third day of trial after seven witnesses had testified. Therefore, we cannot say that the trial court abused its discretion by ruling that the Appellant's request was untimely. The second request, which was clear and unequivocal, was made on the fifth day of trial after twenty-two witnesses had testified. Thus, the trial court properly ruled that the second request also was untimely. The Appellant is not entitled to relief on this issue.

## C. Comment During Opening Statements

Next, the Appellant claims that the trial court erred by not allowing defense counsel to comment about the codefendants' exposure to prison sentences during counsel's opening statement. The State argues that the trial court did not err. We conclude that the Appellant is not entitled to relief.

During trial counsel's opening statement, he stated as follows:

> Ladies and Gentlemen, these co-defendants are charged relating to the same incident. Now they're charged with different crimes. My client's charged with 1st degree murder, and they are charged with a variety of different crimes, but they're charged from incidents relating to the same incident.

> And what that means, is that nobody out of the seven billion people on planet earth, not a single person has a greater motivation to say Jody Hughes did it, than these co-defendants. You see to the extent that they can say Jody Hughes did it, their responsibility is lesser. They won't have to spend as much time in prison.

The State objected, and the parties' approached the bench. The State requested a mistrial because defense counsel "can't get up there and tell what his punishment may or may not be." The trial court denied the motion for a mistrial but sustained the objection and

- 25 -

instructed the jury to disregard "any reference to punishment . . . because that is not your job. That is the job of The Court."

The Appellant raised this issue in his motion for new trial. In its order denying the motion, the trial court ruled that defense counsel's comment violated Tennessee Code Annotated section 40-35-201(b) and, therefore, that the trial court properly sustained the State's objection. On appeal, the Appellant contends that Tennessee Code Annotated section 40-35-201(b) pertains only to a defendant who is on trial, not to witnesses, and that "counsel only suggested to the jury that such witnesses were facing punishment for their alleged crimes if later convicted. He was not intending to recite terms of sentences for such charges." The State asserts that the Appellant's argument "misses the mark" because trial counsel's comment indirectly asked the jury to contemplate the Appellant's potential punishment.

The purpose of opening statements is to allow the attorneys for the parties to present their theories of the case. State v. James Willie Oden, No. 85-109-III, 1986 WL 5047, at *4 (Tenn. Crim. App. at Nashville, Apr. 29, 1986). However, trial courts have wide discretion in controlling arguments of counsel, including opening statements, and a trial court's ruling concerning the arguments of counsel will not be reversed absent an abuse of discretion." State v. Stacy Johnson, No. W2004-00464-CCA-R3-CD, 2005 WL 645165, at *15 (Tenn. Crim. App. at Jackson, Mar. 15, 2005) (citing State v. Sutton, 562 S.W.2d 820, 823 (Tenn. 1978)).

"The right to explore or examine witnesses for bias is a fundamental right," and "[a]n undue restriction of this right may violate a defendant's right to confrontation under the Sixth Amendment of the United States Constitution and Article I, Section 9, of the Tennessee Constitution." State v. Sayles, 49 S.W.3d 275, 279 (Tenn. 2001). Nevertheless, Tennessee Code Annotated section 40-35-201(b) provides that "[i]n all contested criminal cases . . . the judge shall not instruct the jury, nor shall the attorneys be permitted to comment at any time to the jury, on possible penalties for the offense charged nor all lesser included offenses."

This court has consistently held that a trial court did not abuse its discretion by limiting a defendant's cross-examination of a witness when the questioning could expose the jury to the defendant's possible sentences in violation of Tennessee Code Annotated section 40-35-201(b). In State v. Larreal Brown, this court found that the trial court properly sustained the State's objection when defense counsel asked a codefendant, who had been indicted for the same crimes as the defendant, "'And if you were convicted of this, you'd be looking at a hell of a lot of time?'" No. W2018-02128-CCA-R3-CD, 2020 WL 6256868, at *5-6 (Tenn. Crim. App. at Jackson, Oct. 23, 2020). In State v. Nehad Sobhi Abdelnabi, the trial court ruled that defense counsel could not question the codefendant, who was charged with the same crimes as the defendant but pled guilty to reduced charges, about the specific length of sentence the codefendant was facing prior to

his plea. No. E2017-00237-CCA-R3-CD, 2018 WL 3148003, at *16 (Tenn. Crim. App. at Knoxville, June 26, 2018). This court ruled that "further delving" into the codefendant's original sentencing exposure probably would have violated Tennessee Code Annotated section 40-35-201(b) by exposing the jury to the defendant's possible sentences for the charged offenses. Id. Similarly, in State v. Jereco Tynes, this court held that the trial court did not abuse its discretion by prohibiting defense counsel from cross-examining the codefendants about their total sentencing exposure prior to their guilty pleas because doing so would have informed the jury about the punishments the defendant also faced. No. W2010-02511-CCA-R3-CD, 2013 WL 1043202, at *14 (Tenn. Crim. App. at Jackson, Mar. 13, 2013).

In our view, the issue in the present case is quite distinguishable from the cases mentioned above. The defense's theory was that Jerger, Hawkins, and Ashley falsely accused the Appellant of shooting the victim in an attempt to hide their own culpability for the victim's death. Defense counsel tried to espouse the theory of the witnesses' bias during his opening statement by saying, "You see to the extent that they can say Jody Hughes did it, their responsibility is lesser. They won't have to spend as much time in prison." We fail to see how defense counsel's comment violated Tennessee Code Annotated section 40-35-201(b). The codefendants were not charged with the same crimes as the Appellant, and defense counsel did not mention the sentencing exposure of the Appellant or any codefendant. Therefore, the jury could not have discerned the Appellant's potential punishment from defense counsel's comment. We note that immediately before opening statements, the State read counts one, two, five, and six of the indictment to the jury. Thus, when defense counsel made his opening statement, the jury knew that the Appellant had been charged with first degree murder, kidnapping, conspiracy to commit tampering with evidence, and tampering with evidence whereas the codefendants had been charged only with the latter two offenses. We do not think that defense counsel's then stating that the codefendants were facing less time in prison than the Appellant was a reference to punishment as contemplated by the statute. Accordingly, we conclude that trial court abused its discretion by sustaining the State's objection. That said, the trial court's error was harmless. Defense counsel was allowed to explore potential bias during his cross-examination of the witnesses. Therefore, the Appellant is not entitled to relief. See Tenn. R. App. P. 36(b).

### D. Limitation of Jerger's Cross-Examination

The Appellant claims that defense counsel should have been able to reveal to the jury that Jerger gave a false statement in a previous homicide case. The State argues that the trial court did not err. We agree with the State.

Prior to Jerger's testimony, defense counsel requested to cross-examine him about a false statement he gave to the police in a prior reckless homicide case. The trial court ruled that defense counsel could ask Jerger about the prior false statement pursuant to

- 27 -

Tennessee Rule of Evidence 608(b) because the prior false statement was less than ten years old and was "highly probative" of Jerger's character for truthfulness. The State asked if the trial court was going to allow defense counsel to "question [Jerger] about the facts of that case." The trial court stated that the facts of the prior homicide case were not relevant and that defense counsel could ask Jerger only about Jerger's lying to the police in a prior case. On appeal, the Appellant contends that the trial court erred because "[t]he jury should have been able to understand that R.L. Jerger was not just willing to lie, but willing to lie in the most serious of cases - a homicide."

Evidence is relevant and generally admissible when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401, 402. However, even relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Questions regarding the admissibility and relevancy of evidence lie within the discretion of the trial court, and the appellate courts will not "interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." State v. Franklin, 308 S.W.3d 799, 809 (Tenn. 2010) (citing State v. Lewis, 235 S.W.3d 136, 141 (Tenn. 2007)).

Tennessee Rule of Evidence 608(b) provides that

[s]pecific instances of conduct of a witness for the purpose of attacking . . . the witness's character for truthfulness, other than convictions of crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, if probative of truthfulness or untruthfulness . . . , be inquired into on cross-examination.

Before a witness can be questioned, the trial court, upon request, must hold a hearing to determine whether "the alleged conduct has probative value and that a reasonable factual basis exists for the inquiry," and the conduct must have occurred no more than ten years prior to the commencement of prosecution. Tenn. R. Evid. 608(b)(1), (2). This court reviews a trial court's ruling under Tennessee Rule of Evidence 608(b) under an abuse of discretion standard. State v. Reid, 91 S.W.3d 247, 303 (Tenn. 2002).

Initially, we note that the State claims the Appellant has waived this issue because he did not specifically ask to question Jerger about the facts of the prior homicide case and because he did not object when the trial court clarified its ruling that defense counsel could ask Jerger only about giving the prior false statement. We agree with the State. See Tenn. R. App. P. 36(b). In any event, the trial court followed the procedural requirements of Rule 608(b) and properly determined that defense counsel could ask Jerger about his prior false statement to the police because his conduct was probative of his character for truthfulness.

The trial court also properly ruled that the specific facts of the prior homicide case were not relevant to the instant case. Therefore, the Appellant is not entitled to relief on this issue.

## E. Curative Instruction

In an issue related to the previous issue, the Appellant claims that the trial court erred in its wording of a curative instruction to the jury. The State argues that the trial court's instruction was proper. We agree with the State.

While defense counsel was questioning Detective Edwards about Jerger's false statement in the prior criminal case, the Appellant blurted out that the prior case involved a homicide.[3] The State objected, and the trial court sent the jury out of the courtroom. The trial court then admonished the Appellant as follows:

> The reason I asked the Jury to leave the room is I don't want them to hear me fussing at you.
>
> If you remember, we had a Jury-out hearing before R.L. Jerger testified, and I told these lawyers that they were allowed to impeach his testimony . . . , but there was to [be] no mention that it was a homicide case.
>
> Now while your Lawyer is very delicately working through that issue and bringing up the part that he wanted to, you blurted out [something] audible to most everyone in the courtroom, words about it being a homicide case.
>
> . . . .
>
> So I'm gonna have to do a curative instruction. And what I want to do is instruct the Jury to disregard anything that they may have heard from persons in the courtroom, other than the witness on the witness stand. I don't know if they heard it or not.

The State asserted that the Appellant intentionally informed the jury about facts not in evidence and requested an instruction "[a] little bit stronger than that."[4] The trial court proposed to instruct the jury that "the only credible proof that you are permitted by the rules of evidence to consider, are the words from the witness stand." The State said that it

---

[3] We do not know exactly what the Appellant said. The trial transcript shows his comment as "[i]naudible."

[4] We note that during the Appellant's cross-examination testimony, he stated, "I know that [Jerger's] been involved in a prior homicide." The trial court found the Appellant in contempt.

- 29 -

"like[d] that better," but the Appellant, speaking directly to the trial court, stated that the instruction "makes me look pretty bad." The Appellant asked that the trial court not include the word "credible," and the trial court responded as follows:

> Well, I think I need to track the Jury Instructions, and they speak to the admissibility of evidence and it's credible evidence that comes from the witness stand. So, I'm gonna use the word credible -- I -- I'll say evidence that makes it clear -- that it's from the witness stand, and not comments that they may have heard.

When the jury returned to courtroom, the trial court instructed the jurors as follows:

> Ladies and Gentlemen I want to give you a special instruction. The only credible proof that you can consider in this case is testimony from the witness stand. So I am instructing you, if you heard any words spoken that were not spoken from the witness stand, you are to put that out of your mind and disregard it when you later go into the Jury room to deliberate.

On appeal, the Appellant contends that the trial court's insertion of "credible" into the curative instruction left the jury with the impression that he was not credible. The State argues that the trial court's instruction was not a comment on the Appellant's credibility as a witness and "correctly instructed the jury to disregard the words that were not spoke from the witness stand."

As this court has explained,

> The Tennessee Constitution prohibits judges from commenting on the evidence in a trial, but judges may "state the testimony and declare the law." Tenn. Const. art. VI, § 9. A trial judge is obligated to "be very careful not to give the jury any impression as to his feelings or to make any statement which might reflect upon the weight or credibility of evidence or which might sway the jury." State v. Suttles, 767 S.W.2d 403, 407 (Tenn. 1989).

State v. Anthony Dewayne Hood, No. E2008-02298-CCA-R3-CD, 2010 WL 3529002, at *10 (Tenn. Crim. App. at Knoxville, Sept. 10, 2010).

We think the better practice would have been for the trial court simply to instruct the jury to disregard the Appellant's comment. That said, we do not think the trial court's curative instruction could have been construed by the jury as a comment on the Appellant's credibility. The curative instruction essentially advised the jury that it could only consider testimony from the witness stand and that the jury should disregard anything spoken off the witness stand. The instruction did not mention the Appellant. Moreover, in the trial court's preliminary instructions to the jury, the trial court stated that it was each juror's

- 30 -

"job" to "decide whether you believe what each person says, and the importance of his or her testimony." During the final jury charge, the trial court gave a lengthy instruction on the jury's determination of the witnesses' credibility. The trial court then instructed the jury as follows:

> The Defendant testified on his own behalf. His credibility is determined by the same rules which the credibility of the other witnesses is determined. And you will give his testimony such weight as you may think it is entitled.

Generally, we presume that a jury has followed the trial court's instructions. See State v. Butler, 880 S.W.2d 395, 399 (Tenn. Crim. App. 1994). Therefore, we conclude that the Appellant is not entitled to relief.

### F. Limitation of Detective Edwards' Cross-examination

The Appellant claims that the trial court erred by not allowing him to question Detective Edwards about inconsistencies in prior statements that the "accomplices" gave to the police. The Appellant contends that he should have been allowed to point out the inconsistencies during the detective's cross-examination and that he should have been allowed to ask the detective about the inconsistencies. The State argues that while the trial court ruled defense counsel could not keep playing recorded excerpts of the statements under the guise of refreshing the detective's recollection, the trial court did not limit the Appellant's cross-examination of the detective. We agree with the State.

On direct examination, Detective Edwards testified that he interviewed Jerger on the night of October 15. The police located Hawkins, Crumley, and Ashley on October 16, and various detectives began interviewing them. On cross-examination, Detective Edwards acknowledged that Jerger ended up giving him two statements. Hawkins gave three statements to the police. Hawkins gave his first statement to a police officer on October 16. Hawkins spoke with Detective Edwards on October 22 and on a later date.

Defense counsel first questioned Detective Edwards about inconsistencies in Jerger's two statements. Defense counsel then began questioning Detective Edwards about inconsistencies in Hawkins's statements and asked if Hawkins claimed in his statement on October 16 that the Appellant used a gun to force the victim into the Xterra. Detective Edwards answered, "He may have said that, I can't recall specifically that." Defense counsel requested to play an excerpt from Hawkins's recorded interview, and the State objected, asking, "What are we doing, impeaching [Hawkins]?" Defense counsel responded that he had a right to cross-examine Detective Edwards about Hawkins's inconsistent statements and that he needed to play the excerpt to refresh Detective Edwards's recollection. The trial court agreed with defense counsel. The State said that it

was going to object if defense counsel played the entire interview, and defense counsel responded, "Well I'm not gonna play the whole interview."

After defense counsel played the excerpt, Detective Edwards acknowledged that Hawkins said in his first statement that the Appellant used a gun to force the victim into the Xterra. Defense counsel then stated, "[L]et me play your interview [with Hawkins on October 22], because he told you the same thing, didn't he?" Detective Edwards did not respond, and defense counsel proceeded to play the excerpt. Defense counsel then asked Detective Edwards about another claim by Hawkins. Detective Edwards responded that he could not remember, so defense counsel played, over the State's objection, an excerpt of Hawkins's interview for the detective. Later, defense counsel told Detective Edwards that he was going to play an excerpt from Hawkins's first interview so they could talk about "jogging" Hawkins's memory. After defense counsel played the except, the State renewed its objection, stating, "This is exactly [what] I had in my first objection. This is impeachment of Gus Hawkins. . . . And he had an opportunity to do that when Gus Hawkins was sitting here on the stand." Defense counsel advised the trial court that he was only playing the excerpts if Detective Edwards said he did not remember. The trial court agreed with the State, and the following colloquy occurred:

> THE COURT: What I have to do is fit what you're trying to do into the rules of evidence. And it's not a prior inconsistent statement of this witness. It's not a refreshed recollection of this witness.
>
> Now when he says, I don't remember. Then you can refresh his recollection, but I -- I think you could say, were you not sitting in the courtroom when [Hawkins] said 'X'. And that -- and see how he reacts to that.
>
> I'm not trying to hamstring you. I'm trying to give you a lot of free rein so that you can put on your defense, but we've got to do it according to the rules of evidence.
>
> . . . .
>
> [Defense counsel]: I can ask him if the witness in this case, Hawkins made any other inconsistent statements to him?
>
> THE COURT: Yes.
>
> [Defense counsel]: If he does not remember I can refresh his recollection?

THE COURT: I think then you have to say, didn't he tell you -- you know, this on January 3rd, and this on January 4th.

. . . .

The State's right on that one, this would have been great cross examination for Mr. Hawkins. And I think you did a lot of this on his cross examination.

[Defense counsel]: Yeah, I did.

THE COURT: So now what you have to do is just summarize it. And you can't impeach his testimony with that evidence unless the Detective says, oh, no he never said that.

[Defense counsel]: All right.

THE COURT: Then you can play the tape.

On appeal, the Appellant contends that he wanted to question Detective Edwards about Hawkins's prior inconsistent statements "not to impeach the detective but to refresh his memory" and that the trial court "clearly obstructed counsel from pursuing a legitimate course of cross-examination." However, as noted by the State, the trial court gave defense counsel considerable leeway to refresh the officer's recollection about Hawkins's prior statements to the police. Although the trial court ultimately ruled that defense counsel could not keep playing excerpts from Hawkins's prior interviews, the trial court did not prevent the Appellant from questioning the officer about Hawkins's inconsistent statements. Therefore, we conclude that the Appellant is not entitled to relief.

G. Extrinsic Evidence for Impeachment

Finally, the Appellant claims that the trial court erred by suppressing the testimony of attorney Randy Rogers and that Rogers's testimony was necessary to impeach Ashley. The State argues that the trial court properly prevented the Appellant from impeaching Ashley with the extrinsic evidence because Ashley's testimony was not completely inconsistent with her pretrial statement to Rogers and because the Appellant did not give Ashley the opportunity to explain the inconsistency. We conclude that the trial court did not err.

In support of the Appellant's argument that the trial court should have allowed Rogers to testify, the Appellant cites to defense counsel's cross-examination of Ashley about a telephone conversation she had with the Appellant. The telephone conversation occurred after the Appellant's preliminary hearing. At that time, Ashley was out of jail on bond, but the Appellant was in jail. Ashley stated on cross-examination that she did not

remember her telephone conversation with the Appellant, so defense counsel played a portion of the recorded conversation for her. The following exchange then occurred:

> Q. Okay. Now you hear that? [The Appellant] asked you if you told your Lawyer I don't want to testify today, what would be the consequence? You said at first, I don't know, but then you said, I would probably have gone back to jail?
>
> A. I mean, I -- I don't know.
>
> Q. What -- was that your understanding on that day?
>
> A. Of? I mean -- that wasn't the understanding. I mean, I just took it as to tell him that.

Later during the Appellant's case-in-chief, defense counsel advised the trial court that he wanted to call Rogers, the attorney for the Appellant's mother, to testify. Defense counsel stated that the purpose of Rogers's testimony was to impeach Ashley's testimony that she did not feel pressured to testify against the Appellant. The trial court responded that, according to the trial court's notes, Ashley testified that she told the Appellant that she would go back to jail if she did not testify, "which would be some evidence of pressure she felt." Therefore, the trial court ruled that Rogers's testimony would be consistent, not inconsistent, with Ashley's testimony. Defense counsel responded as follows:

> Well, and Your Honor, she also said, I questioned her, did you ever tell anybody that you were being pressured to testify? And she said, no. It was in a series of questions that I asked her about whether she had been offered any sort of deal or given any sort of assurances. And so, she did testify that she had never told anybody that she was pressured to testify and [the] expected testimony would directly contradict that statement.

The trial court maintained that according to the trial court's notes, Ashley told the Appellant that she would go back to jail if she did not testify at his preliminary hearing. Thus, the trial court found that "there is [nothing] to impeach." Nevertheless, the trial court allowed defense counsel to present Rogers's testimony in an offer of proof.

Rogers testified that he represented the Appellant's mother in her charges related to the victim's death. Ashley, who was being represented by another attorney, accompanied the Appellant's mother to a meeting with Rogers. Rogers stated that during the meeting, Ashley told him that "the District Attorney General's office . . . was trying to get her to testify in a certain way . . . . And she said, I just think -- I'm being forced to talk about stuff that I really shouldn't, and can't, or don't know, and that sort of thing." The trial court found that Rogers was credible but that his testimony was consistent with Ashley's

testimony. Accordingly, the trial court again ruled that the Appellant could not use the extrinsic evidence to impeach Ashley.

Tennessee Rule of Evidence 613 allows the use of prior inconsistent statements to impeach a witness. Specifically, Tennessee Rule of Evidence 613(b) provides that "[e]xtrinsic evidence of a prior inconsistent statement by a witness is not admissible unless and until the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require." If a party presents a prior inconsistent statement to the witness, the witness "has several possible responses: the witness can admit, deny, or not remember making all or part of the statement." Cohen et al., Tennessee Law of Evidence , § 6.13[5][a] (6th ed. 2011). If the witness admits making the prior inconsistent statement, extrinsic proof of the statement would be cumulative and, therefore, inadmissible. Id. If the witnesses denies or does not remember making the inconsistent statement, extrinsic proof of the statement is admissible. "[I]t is well-established that trial courts have broad discretion in determining the admissibility of evidence, and their rulings will not be reversed absent an abuse of discretion." State v. Stinnett, 958 S.W.2d 329, 331 (Tenn. 1997).

During defense counsel's cross-examination of Ashley about the telephone conversation she had with the Appellant, defense counsel did not specifically ask Ashley if she told the Appellant or anyone else that she was being pressured or forced to testify. Therefore, defense counsel could not present Rogers to impeach Ashley.

### III. Conclusion

Based upon the oral arguments, the record, and the parties' briefs we find no reversible error and affirm the judgments of the trial court.

_____
NORMA MCGEE OGLE, JUDGE